OPINION OF THE COURT
H. Patrick Leis III, J.
This matrimonial action was commenced on November 7, 2011. The parties first appeared in court on January 13, 2012. The case was tried on June 25, 26, 27, 2013, July 2, 8, 15, 16, 19, 24, 29, 2013, and September 3, 13, 2013. The defendant appeared pro se during the entire proceeding. The plaintiffs post-trial memorandum was received on September 30, 2013 and the defendant’s posttrial memorandum, although not properly submitted, was faxed to this court on October 3, 2013.[1]
This case highlights the difficulties that arise when one party uses their self-represented status as both a sword and a shield in an attempt to gain undue advantage and behaves in a manner that the court would never tolerate from an attorney. The manner in which the defendant presented his minimal evidence, fueled by his own emotional agenda, lacked direction, reason and oftentimes was totally devoid of probative value. As a result of the defendant’s lack of clarity in his presentation of evidence and the rambling nature of his posttrial memorandum, the court was required to order numerous days of trial testimony in an effort to search the record for any evidence supporting the defendant’s amorphous positions, thereby delaying this decision.
Prior to trial, the parties reached a settlement regarding custody of their son, T, and during the trial the parties reached a settlement regarding child support and equitable distribution of all of their real estate holdings. Based on the plaintiffs credible, sworn testimony that the parties’ marriage has irretrievably broken down for a period of at least six months prior to the commencement of this action, the court hereby grants the plaintiff a divorce pursuant to Domestic Relations Law § 170 *502 (7). The court issues this trial decision on the remaining issues of marital debt, personal property and counsel fees.
Facts
The plaintiff G.T. is 50 years old and the defendant A.T. is 53 years old. The parties were married on December 19, 1987. They have two children; E who is 21, and T. who is 16. The defendant is an engineer. He has a college degree, a Master’s degree, and has completed most of the credits required for a doctorate. The plaintiff has a doctorate in biochemistry and molecular physics. When the parties married, the plaintiff earned approximately $14,000 per year and the defendant earned $23,000 per year. In 1990 they moved from Virginia to New York. The defendant was employed by Brookhaven National Laboratories, earning $50,000 per year. The plaintiff worked at Cold Spring Harbor Laboratories making $23,000 per year. When the plaintiff lost her job in 2005, she was earning $73,000 annually. She then went back to school and obtained a degree in computer programming. This allowed her to gain employment, combining her previous areas of expertise with her newly acquired knowledge of computers and software. She presently earns $45,986 per year (see plaintiffs exhibit 14). When the defendant left his job, which also occurred in 2005, he was earning $90,000 annually. Unlike the plaintiff, he has not obtained employment since leaving his job, choosing instead to manage the parties’ real estate holdings.
Although the defendant first testified that he lost his job in 2005, he admitted during cross-examination that he could have remained employed if he had so desired. The defendant has not shown any proof that he ever tried to find another position after leaving his job in 2005. The plaintiff testified that she asked the defendant to find employment but he refused, telling her that he felt it was beneath him to work for anyone. It was the defendant’s belief that by constantly refinancing existing properties to purchase additional ones, he would make the parties rich. Instead, said refinancing put the parties in debt and caused expenses to exceed income. While the plaintiff signed the requisite financial documents allowing the defendant to refinance existing properties to purchase new ones, she stated that she did so reluctantly and under coercive pressure from the defendant. Throughout the marriage the plaintiff continually told the defendant that she wanted the real estate holdings to be an adjunct to their full-time employment. In fact, the plaintiff *503 stated that the defendant’s continued refusal to find employment was a significant factor contributing to the deterioration of the marriage. The plaintiff felt that the real estate “empire” that the defendant was attempting to build put the family in a precarious financial position and was unwise.
The plaintiffs health is good. According to the defendant, in 2005 he was diagnosed with type 2 diabetes and he takes medication for this condition. In addition, he states that he takes high blood pressure medication. There is no evidence that either of these conditions affects his ability to work. In fact, he apparently is able to travel extensively to manage the parties’ real estate holdings as well as his separate Pittsburgh property.[2]
Pursuant to the parties’ stipulation concerning the distribution of their real estate holdings, each party is to have certain enumerated properties deeded to him or her exclusively with a hold-harmless clause protecting the other party who is no longer on the deed, from any liabilities for the other’s properties.[3] Therefore, pursuant to the parties’ equitable distribution settlement agreement, all debts currently owed on the parties’ respective properties are the responsibility of the owning party.[4] Furthermore, the parties have resolved the issue of child sup *504 port* **[5] for T. by allowing the defendant to prepay his support obligations for T. who is 16 years old, by giving the plaintiff the marital home which has an equity of approximately $90,000 to $120,000.
Debts
The testimony established that at the time of trial there was a Discover card in the name of the plaintiff, and a Visa and MasterCard in the defendant’s name.[6] The parties have accrued debt on these cards during the pendency of this case.[7] As no evidence was submitted that such debt was incurred for the benefit of the other spouse or incurred with the other spouse’s permission, and as it accrued on each party’s individual credit card(s) after commencement of this action, said debt is the sole responsibility of the party whose name appears on the credit card account. For example, it appears from the testimony and exhibits that the defendant’s MasterCard had a balance of $14,500 at the time of trial and he had a balance of $19,500 on his Visa card at the time of trial.[8] It is unknown what, if any, balance was on each of those cards on the date of commence *505 ment and how any such balance was paid as there was no evidence submitted by the defendant on these issues. There is testimony, however, that the defendant incurred these credit card debts that existed at the time of trial, after the commencement of the case by paying for his own living expenses after he moved out of the marital residence.[9] Also, these debts were substantially inflated by the defendant’s choice to stay in a hotel for several months, at a cost of $60 per day, rather than to reside in one of the parties’ vacant rental properties for free. Without proof of the debts owed on those two cards prior to commencement and how the balances, if any, were paid (either with joint or individual funds), the court is constrained to find that the credit card balances that existed at the time of trial accrued after the case was commenced and are, accordingly, the sole responsibility of the defendant to pay.
The plaintiff testified and submitted credit card billing statements to establish that from the commencement of this case until trial she incurred $36,643.38 in charges on her Discover card. That amount is solely the plaintiffs responsibility to pay.[10] The plaintiff, however, admitted that she paid $2,500 of her personal post-commencement credit card debt from the parties’ joint business account. Accordingly, the defendant is due a credit in the amount of $1,250 representing his share of the money taken from the joint account by the plaintiff to pay for her separate debt. There is also credible testimony that the defendant paid $14,000 of his post-commencement personal credit card expenses from the joint business account. Accordingly, the plaintiff is due a credit in the amount of $7,000 representing her share *506 of the money taken from the joint account by the defendant to pay for his separate debt. After subtracting the defendant’s credit of $1,250 from the plaintiffs credit of $7,000, the court finds that the plaintiff is due a credit from the defendant in the amount of $5,750.
Regarding the retirement account loans, the credible evidence established that the parties took out loans from their individual retirement accounts prior to the inception of this case; the plaintiff has two pre-commencement retirement loans outstanding and the defendant has one pre-commencement retirement loan outstanding. The plaintiff owes approximately $3,980 on one loan as of the time of trial and $2,305 on another loan. The defendant owes approximately $32,800 on his loan as of the time of trial. The court finds that as these liabilities were incurred prior to the commencement of this action and during the marriage, the parties are responsible to pay half of the outstanding balance from those loans to each other. Accordingly, the defendant shall owe a credit to the plaintiff equal to half of her retirement loan debt that she is responsible to pay, or $3,980 plus $2,305, divided by two which is $3,142.50. And the plaintiff shall owe a credit to the defendant equal to half of his retirement loan debt that he is responsible to pay, or $32,800 divided by two which is $16,400. By subtracting the credit due to the plaintiff in the amount of $3,142.50 from the credit due to the defendant in the amount of $16,400, the court finds that the plaintiff owes a credit to the defendant in the amount of $13,257.50 representing the adjusted amount for which she is responsible regarding the defendant’s pre-commencement retirement loan debt. There is a second loan that the defendant took from his retirement account after the commencement of this case in the amount of $10,000 that shall be his sole responsibility to pay.
The evidence also showed that there is a bill for $1,136 representing the services of an attorney, Paul Rethier, which the parties agree should be split equally. Thus, to the extent that this bill remains unpaid, each party must pay $568 to Mr. Rethier. To the extent that such bill has been paid, the non-paying party must repay $568 to the party that paid said bill. There are also monies due Neil Paul that the parties agree should be split equally. The only evidence concerning that debt is found in the unsubstantiated chart compiled by the defendant, admitted into evidence as defendant’s exhibit P Since both parties agree that this is a joint obligation in the amount of $1,600, each party *507 owes Mr. Paul half of his bill ($800). To the extent that this bill has been paid, the non-paying party shall repay his or her 50% share of that bill to the party that paid said bill.
In addition, the plaintiff shall receive a credit equal to the amount that she has paid for the defendant’s post-commencement medical bills which, from the testimony adduced at trial, was $3,500. Finally, the parties agree that there is an additional joint debt from an unsecured L28 Advantage Line of Credit loan that was approximately $14,950. Each party must pay $7,475 towards that debt.[11] To the extent that such debt has been paid, the non-paying party must repay his or her 50% share of that debt ($7,475) to the party that paid said line of credit.
Counsel Fees
The Court of Appeals has held that
“[p]ursuant to Domestic Relations Law § 237 (a), a court in a divorce action may award counsel fees to a spouse ‘to enable that spouse to carry on or defend the action or proceeding as, in the court’s discretion, justice requires, having regard to the circumstances of the case and of the respective parties.’ . . . ‘[In] exercising its discretionary power to award counsel fees, a court should review the financial circumstances of both parties together with all the other circumstances of the case, which may include the relative merit of the parties’ positions’ ” (Johnson v Chapin, 12 NY3d 461, 467 [2009], quoting DeCabrera v Cabrera-Rosete, 70 NY2d 879, 881 [1987]).
In addition, Domestic Relations Law § 237 (a) states that “[t]here shall be rebuttable presumption that counsel fees shall be awarded to the less monied spouse.” Moreover, when awarding counsel fees, the court must not only consider the parties’ financial positions but any delay incurred as a result of a party’s obstructionist tactics (Johnson v Chapin, 12 NY3d at 467).
Here, it is clear to this court from the testimony of the parties, including the admission by the defendant that he voluntarily left his employment where he was earning $90,000, that the defendant is capable of working full time and earning at least $90,000. Such figure is imputed based upon the defendant’s *508 prior employment experience, as well as his future earning capacity in light of his educational background (see Moffre v Moffre, 29 AD3d 1149, 1150 [3d Dept 2006]). The plaintiff is currently employed full time and earns less than $50,000 which is about half of what the court finds that the defendant is capable of earning. Despite the husband’s protestations to the contrary, an objective view of the record, including his imputed future earnings, shows that he is in a superior financial position. Thus, the plaintiff is not the monied spouse for purposes of Domestic Relations Law § 237 (a).
In considering whether the defendant should be responsible for all or a portion of the plaintiffs counsel fees, the court has weighed not only the financial circumstances of the parties but any actions taken by either party to prolong, obfuscate or delay the orderly process of this trial (see Johnson v Chapin, 12 NY3d at 467). The court finds that the defendant has in fact engaged in a pattern of obstructionist conduct which unnecessarily delayed and increased the legal fees incurred in the litigation (see Cooper v Cooper, 32 AD3d 376 [2d Dept 2006]; De Bernardo v De Bernardo, 180 AD2d 500, 502 [1st Dept 1992]).
For example, the defendant’s motion to recuse, filed on the eve of trial, can only be viewed as a delay tactic. The resolution of this motion took the better part of the first day of trial. Even though the defendant never expressed any displeasure with the court during the initial approximately 18 months that the parties appeared before the undersigned, on the eve of trial the defendant filed a recusal motion alleging that the court had been disrespectful of the parties’ culture and faith, repeatedly pressured the defendant to retain counsel, and coerced and threatened him. The defendant stated in said motion, inter alia, that he would be making a formal complaint to the Commission on Judicial Conduct if the court did not recuse on the matter. The motion’s threatening words, tone and nature were calculated to intimidate the court into removing itself from the matter to avoid a complaint being made to the Commission.
The plaintiff and her attorney opposed the recusal motion. The plaintiff stated that the court had never disparaged the parties’ culture or faith and had always been respectful to both parties. In addition, the plaintiff alleged that the defendant’s motion was made solely to gain a postponement of the trial and a delay of the divorce action which he was adamantly opposing. The court denied the defendant’s recusal motion finding it frivolous and pointed out that the defendant had only spoken of the *509 court in glowing terms during the many preceding months. In fact, the defendant placed many of his favorable remarks concerning the court’s conduct in written correspondence dated November 11, 2012, November 15, 2012, November 16, 2012 and March 7, 2013. Moreover, the court notes that in the most recent letter dated March 7, 2013, which the defendant himself submitted into evidence at trial (defendant’s exhibit Q), he praised the court’s actions up to that point and made no mention of any threats, coercion or disrespect to the parties by the court during the preceding months in issue.
Further, in spite of the court’s repeated explanation to the defendant that the plaintiff’s action was based on irretrievable breakdown (Domestic Relations Law § 170 [7]) which cannot be overcome by the defendant’s testimony at trial once the plaintiff swore to the fact that the marriage has irretrievably broken down for a period of at least six months prior to the commencement of the action (see Rinzler v Rinzler, 97 AD3d 215, 218 [3d Dept 2012]; Palermo v Palermo, 35 Misc 3d 1211[A], 2011 NY Slip Op 52506[U] [Sup Ct, Monroe County 2011, Dollinger, J.]), the defendant persisted in litigating and contesting grounds.
Also, the defendant wasted additional time by making a lengthy opening statement which had no relevance to the proceeding, dealt exclusively with his own self-serving perceptions and in essence called on the plaintiff to reconcile with him. Furthermore, the defendant’s cross-examination of the plaintiff took four days because the defendant improperly testified during most of the cross-examination and refused to follow the court’s direction to ask the plaintiff questions. In addition, he disregarded the court’s rulings when it sustained objections and he continued to pursue areas of inquiry that the court had prohibited. The defendant engaged in arguments with the court concerning its rulings, failed to follow its instructions and shouted at the plaintiffs counsel in an aggressive, hostile and disrespectful manner as well as yelled at the plaintiff when he cross-examined her. He also frequently expressed his displeasure with the court’s rulings, often reminding the court of his intention to file a complaint with the Commission on Judicial Conduct.[12] While the defendant certainly has the right to file a complaint with the Commission on Judicial Conduct, he has no *510 right to attempt to intimidate the court into ruling in his favor by threatening it with the filing of such a complaint. Finally, despite being repeatedly directed not to do so, the defendant continually revisited and improperly attempted to reargue the court’s denial of his recusal motion as well as its previous decision issued after an emergency hearing held months prior to trial that gave exclusive use and occupancy to the plaintiff and prevented him from reentering the marital residence. All the while the plaintiff was taking time off from work (she almost exhausted her vacation and sick time) and was paying her attorney by the hour.[13] As a result of the defendant’s conduct, the plaintiff had to endure 12 days of trial rather than the three or four days that it should have taken.
The plaintiffs credible testimony established that she paid an $8,000 retainer to her first attorney that was virtually depleted early on in the case by the defendant’s voluminous emails, letters and lengthy phone calls to counsel and his demand for “emergency” meetings.[14] As a result of the defendant’s actions, by the time the plaintiff was forced to discharge her first attorney (to appease the defendant), there had been only one or two court appearances and no discovery other than the exchange of net worth statements. After many months of fruitless settlement negotiations between the parties,[15] the plaintiff retained her present trial counsel, Steven J. Homayoon. She paid counsel a modest $1,275 retainer. Later, she paid him an additional $2,000. The $8,000 payment to prior counsel, the retainer to trial counsel and the additional $2,000 paid to trial counsel were all made from the plaintiffs separate funds that she earned subsequent to the commencement of this action.
*511 Mr. Homayoon’s charge of $215 an hour is extremely reasonable given his level of experience, the efforts expended on his client’s behalf during this arduous proceeding and the results he obtained. The court finds that Mr. Homayoon did an excellent job for his client and advocated her interests in an environment made extremely unpleasant and contentious by the defendant’s open disrespect for him. Mr. Homayoon maintained his composure and forcefully argued the plaintiffs positions providing the plaintiff with the ability to stand up to a man who, the credible evidence established, had intimidated and attempted to control her life for the better portion of the parties’ marriage.[16]
The defendant’s actions and conduct required the plaintiff to take more time off from work and unnecessarily increased her counsel fees. By contrast, the defendant has remained unemployed and self-represented throughout this divorce action and he has suffered no pecuniary consequence by prolonging and delaying the matter. Indeed, he could have settled the child support and real estate matters and made his position clear on the few issues remaining in one or two days. Simple justice dictates that the defendant, who chooses to function from a position of anger and resentment, not be allowed to purposely drive up the plaintiffs counsel fees and act in such an inappropriate manner, without being made responsible for all of the trial fees. Therefore, in an exercise of this court’s discretion, the defendant is responsible for all of the plaintiffs counsel fees for trial. Mr. Homayoon’s testimony and invoices (plaintiffs exhibits 21, 25) amply demonstrate the hours expended by him during this contentious trial. Counsel’s abilities at trial are deserving of a fee far in excess of the $215 an hour charged. Pursuant to counsel’s testimony and exhibits 21 and 25 in evidence, the plaintiffs counsel expended 51 total hours on trial.[17] Therefore, the bill for the plaintiffs counsel’s time on trial is $10,965. Ac *512 cordingly, the court finds that defendant owes to the plaintiff $10,965 representing the attorney’s fees charged to the plaintiff for this trial (see Domestic Relations Law § 237 [a]; see also Quinn v Quinn, 73 AD3d 887 [2d Dept 2010]). Thus, the plaintiff has a credit of $10,965.
Summary of Credits
The court finds that the plaintiff owes to the defendant a total credit of $13,257.50 (representing the adjusted retirement loans credit). In addition, the court finds that the defendant owes to the plaintiff a total credit of $20,215 (representing the adjusted joint bank account withdrawal credit, the defendant’s medical bills, and the attorney’s fees). By subtracting the credit due to the defendant from the credit due to the plaintiff, the court concludes that the defendant owes $6,957.50 to the plaintiff ($20,215 - $13,257.50 = $6,957.50). This amount shall be paid within 30 days of this decision.
Personal Property
The defendant did not request personal property during the trial nor has he requested any in his posttrial memorandum. Nevertheless, the court will direct, pursuant to the plaintiffs consent, that the items requested by the defendant in settlement negotiations, detailed in the plaintiffs posttrial memorandum, be given to him. The defendant will have 45 days after the date of this decision to retrieve the following items of personal property if he so chooses, at the curbside unless a police officer is present and the plaintiff agrees to allow him to enter the marital home: All deities Dev Ghar; two Ganesha idols; one Krishna idol; two Paat (plaintiff keeps Natarog idol); all musical instruments and storage racks except one harmonium and two tablas; all objects of memories of defendant’s parents; public address system; half of the CDs and DVDs and two storage units (plaintiff keeps two storage units); framed pictures of defendant’s family; P’s Bharathatyam frame; kids’ framed partition (plaintiff keeps prints); Indian paintings; painting of horses; painting of house and boat; video cameras; newer steel dinner plates from India; dining table with chairs and extensions; sofa in family room; BBQ; half of the pots and pans; and the defendant may have the parties’ old computers if he agrees to delete all of the files and information from the hard drives. Finally, all property located at the various rental properties shall belong to the party owning said property as per the parties’ equitable dis *513 tribution settlement regarding their real estate holdings. All other personal property shall be the property of the party possessing it or having title to it.
Therefore, upon consideration of the foregoing, it is ordered that the plaintiffs request for a divorce pursuant to Domestic Relations Law § 170 (7) is granted; and it is further ordered that each party is to pay Mr. Rethier $568, or to the extent one party has paid this bill, the non-paying party must pay this amount to the party who paid said total bill; and it is further ordered that each party shall pay to Mr. Paul $800 or to the extent one party has paid this debt, the non-paying party must pay this amount to the party who paid said total debt; and it is further ordered that the defendant shall pay to the plaintiff the sum of $6,957.50 within 30 days of this decision; and it is further ordered that the parties are to divide the personal property as stated above and the parties are to make arrangements for the defendant to retrieve his personal property within 45 days of this decision.

. Only three or four pages out of the 39 pages comprising the defendant’s posttrial memorandum concern issues tried to conclusion before this court. While the defendant continues to raise in his posttrial memorandum arguments concerning this court’s previous decisions regarding his recusal motion and the plaintiffs emergency application for exclusive use and occupancy of the marital residence, and the defendant’s desire to undo the equitable distribution settlement, as well as his intent to file a complaint with the Commission on Judicial Conduct, none of these issues is properly before the court and, accordingly, they will not be addressed.

. The defendant argues in his posttrial memorandum that he should be paid $38,000 for his time and services in managing the parties’ properties since the commencement of the case (and that the plaintiff be awarded $10,000 for her time and services) and refers the court to “the rationale in attachment D.” As there was no evidence of any agreement by the parties for payment to either party, no evidence of payment for such services to either party during the marriage, nor any court order for reimbursement out of any funds for the management of the properties, the request is denied. In any event, there was no “attachment D” included with the submission. Indeed, in the defendant’s fax cover letter to his posttrial memorandum he mentions that there are only three attachments and he refers to them as “A, B, and C.” Moreover, the evidence at trial established that the plaintiff put in a similar number of hours and effort (mostly at night and after work) as the defendant in managing the properties with the exception of the property in Pittsburgh that the plaintiff transferred to the defendant prior to trial. That property, to which the defendant claims to have devoted many hours, was solely the defendant’s project and as such the plaintiff should not be held responsible for any of the time that the defendant donated to it.

. While some of the properties are owned free and clear of any debt, many of the properties at issue have mortgage debt attached in both of the parties’ names issued by nonparty banks, that will remain in both of their names after the deeds are transferred, until such time as the owning party is able to remove the nontitled party from the note and mortgage.

. Using the testimony of the parties and the charts (plaintiffs exhibits 8, 10) supplied pursuant to the parties’ agreement to use Zillow.com as the source for the value of the properties (unless a formal appraisal was done), in *504 total the defendant received 20 properties with an equity of $612,354 and a net monthly rental income of $7,127 while the plaintiff received nine properties with an equity of $584,603 and a net monthly income of $1,474.

. Based on an agreed upon imputed income to the defendant of $120,000 per year as placed on the record in this court.

. At trial, the defendant asked the plaintiff during cross-examination about the existence of a Lowe’s credit card account in his name. It appears, according to the defendant’s questioning of the plaintiff and the unsubstantiated chart summary of bills that was admitted into evidence as defendant’s exhibit F¡ that there was a balance of $5,300 owed on the Lowe’s card at the time of trial. The plaintiff credibly disavowed any use or knowledge of this card post commencement and no evidence was offered regarding the amount, if any, owed on that card prior to the commencement of the case. The defendant has thus failed to offer any proof of an amount owed on the Lowe’s account prior to the commencement of this case. Therefore, this court is unable to determine any amount the plaintiff should be responsible to pay. Accordingly, as the Lowe’s credit card debt is in the defendant’s name, it must remain his sole responsibility.

. There is also an American Express card in the name of a corporation that was utilized in connection with the defendant’s Pittsburgh property, which appears to have been exclusively used by him. This debt, the credible evidence establishes, is solely the defendant’s responsibility.

. While the plaintiff testified at trial that she believed the defendant’s Visa card may have had a balance of approximately $15,000 at the time of commencement and that the MasterCard may have had a balance of approximately $1,000 or $2,000 at the time of commencement, no credit card billing statements were offered in evidence and the court cannot make a find *505 ing based on a party’s speculation. The defendant has not submitted any proof of his pre-commencement credit card debts. The court has spent countless hours, which caused a delay in the issuance of this decision, ordering, waiting for, and reviewing trial transcripts in an effort to uncover any evidence from the defendant regarding the issue of his credit card debt at the time of the commencement of this action, all to no avail. No evidence can be found concerning his credit card debt at the commencement of the case. There was, thus, a complete failure of proof on the defendant’s part to establish the amount of his credit card debt at the time of the commencement of this case and a complete failure of proof regarding any obligation of the plaintiff to pay any part of such debt.

. The defendant moved out of the marital residence within days after being served with the summons and complaint.

. It appears from the evidence submitted that the plaintiff had paid the entire balance that was owed on her Discover card prior to the commencement of this action from her separate funds and she is not seeking a credit from the defendant for any portion of such payment that the defendant may have been responsible to pay.

. The court concludes from the parties’ testimony that the “Advantage Line of Credit,” the “Teacher’s Advantage” debt of approximately $15,000 and the “L28 unsecured equity line” debt of approximately $15,000 discussed in the plaintiffs posttrial submission are all one and the same.

. In fact, the defendant continues these same remarks in his posttrial memorandum stating: “As a courtesy to your Honor, and [sic] allow Your Honor the time and opportunity to take right steps in the direction of a proper *510 conclusion of this trial, I shall hold back the formal complaint to the Commission and initiation of the Appeal process” (defendant’s posttrial mem at 17).

. Indeed, when the defendant’s attempts to undo or negate the parties’ previous real estate settlement were unsuccessful, the defendant stated he planned to appeal and then threatened that “we’ll be in court forever” (July 29, 2013 tr at 28, line 7). This threat along with his actions manifested his true intent to prevent this case from concluding.

. No affirmation of legal services has been submitted nor any evidence regarding the reasonableness of the fees of plaintiffs prior legal counsel.

. Such negotiations were replete with the defendant’s expressions (in writing and orally to the court) of sadness for the situation and readiness to settle based upon any settlement that the plaintiff desired. Indeed, at one point, the defendant had asked the court to give everything to the plaintiff. Such sentiment, however, would then turn to anger, hurt pride and indignation, resulting in his withdrawal of any settlement acceptance previously given, followed by subsequent requests to again negotiate a settlement.

. The defendant’s controlling nature was made abundantly clear during the pendency of the case. In fact, when the defendant was not bombarding the plaintiffs prior counsel with correspondence and depleting her retainer, the defendant refused to negotiate or even communicate with the plaintiff through her prior counsel, demanding instead that he negotiate or communicate directly with the plaintiff even though she was represented by counsel. His actions towards the plaintiff in trying to control her during settlement negotiations when she was represented by prior counsel forced the plaintiff to proceed pro se during the settlement negotiations until a trial was imminent.

. This figure includes the hour of time the plaintiff’s counsel had to spend reviewing the defendant’s motion to recuse and writing to the court in regards to that motion which was made on the first scheduled day of trial.