OPINION OF THE COURT
Richard A. Dollinger, J.
Being “house rich and cash poor” can be a homeowner’s curse. In this case, the phrase dramatizes a difficult quandary for a couple going through a divorce, and impacts the wife’s claim for temporary maintenance. The husband moves to set his maintenance award to the wife at $2,500 per month. He *1005 requests that it be paid in the form of direct payment of the mortgage on the couple’s marital residence, the payment of real property taxes, the payment on a home equity line of credit (HELOC), and the payment of the remaining $185 directly to the wife. The husband also seeks an order directing the sale of the marital residence and attorney fees. In response, the wife cross-moves for assorted relief, including a requirement to have the husband directly pay the “carrying charges” on the marital residence (including the mortgage, the HELOC, utilities, cable, credit card bills, the wife’s cell phone bill, insurance, and real property taxes). The wife seeks an award of maintenance for $1,500 per month, above and beyond the above-listed costs. She also seeks an award of attorney fees as the lesser moneyed spouse. (Domestic Relations Law § 237 [a].)
The incomes of the parties are widely disparate. The wife recently retired from her job, abandoning a $15,000 a year income. She claims that she retired in reliance on representations made by her husband regarding their married future. In retiring, she also lost direct access to health insurance benefits. In addition, she argues that reentering the work force, at age 54, is a daunting and difficult task. In contrast, the husband, at the same age, earned more than $152,000 in 2013.[1]
The difficulty in this case arises from a series of practical problems. First, the marital residence—the “house rich” part of the equation—is an expensive home: a four-bedroom residence that contains a hot tub, a swimming pool, and other amenities, including two dogs. According to the wife, the upkeep costs— mortgage, insurance, taxes, and utilities—are more than $4,000 per month. Second, the couple’s children, already emancipated, continue to reside in the home. The wife argues that the children need living accommodations and any decision to sell the house would eliminate that option for them. Third, during the course of this divorce, the husband has altered his payments for the house. According to the wife, this reduction in monthly payments for housing costs has caused her to live on less than $200 per month for non-housing-related expenses, and she has resorted to paying these other expenses on a credit card. This has driven the balance on the credit cards to over $20,000—the “cash poor” part of the equation.
*1006 In short, the overall expenses for the house, its upkeep, and any reasonable living allotment to the wife would total more than $75,000 annually. In view of these expenses, the wife asks the husband to pay $1,500 per month in maintenance, and an additional $4,500 per month for household expenses. These expenses and the living allowance described as maintenance would total approximately $6,000 per month or more than $70,000 annually. And even if these amounts are paid, the wife, by her own admission, will be plunged further into debt.
Given these demands, and the limited income, this court is asked to determine whether the very expensive marital residence—the costs of which have the practical impact of escalating the maintenance payments—should be sold and whether an upward modification of maintenance during the pendency of the action is permitted under the temporary maintenance guidelines.
The Interlocutory Sale of the House
Before deciding the amount of maintenance, this court pauses to review an issue, which, although well-settled in New York, nonetheless requires a second look: whether the doctrine of Kahn v Kahn should be continued in a post-no-fault divorce landscape. (43 NY2d 203 [1977].)[2] Kahn v Kahn holds that a judge, sitting as this court does in this case, may not order the sale of the marital residence, during the pendency of the action, over one spouse’s objection. The impact of this rule on this case is that the husband, who has significant, but not substantial, income, will pay the housing costs for his wife and emancipated children at a house that neither parent can separately afford. (Based on the income and expense data available to the court, they would struggle to afford it even if they remained together.) The housing costs—mortgage, taxes, utilities—will likely eat up the entire maintenance amounts that the husband will reasonably pay either for temporary or permanent maintenance. In practical terms, the husband, in this instance, is paying over maintenance to lenders, taxing authorities, utilities, and cable *1007 and cell phone companies rather than his wife. While sustaining the wife’s current lifestyle by paying these large expenses, the husband’s payment of these housing expenses is eroding his ability to pay other costs for his wife or, if he chooses, his children, in the future.
In this court’s view, Kahn v Kahn should be reexamined. While the ancient rules regarding how married couples hold title to real property embody important legal rights as to third parties, these rights clash with the practical reality of a divorce. When two residences are now required, and one spouse continues to reside in an expensive marital property, family finances soon become drained to pay an exorbitant mortgage and high taxes. In addition, the recipient spouse sits on the nonresident spouse’s equity (the payor’s share of any equity) in the property—without any recognized contribution—until the final judgment of divorce. The resident spouse gets to use the nonresident spouse’s equity without cost until the final judgment of divorce, a process that can take years, and when the judgment is finally granted, the sale of the property (and the equity payment to the payor spouse) may take even longer.
The current landscape in divorce matters, as dictated by the 37-year-old, pre-equitable distribution, pre-no-fault divorce, pretemporary maintenance guidelines holding in Kahn v Kahn, does not accommodate this real-world difficulty. Other courts have suggested some movement away from the strict rule in Kahn. In Stratton v Stratton (39 Misc 3d 1230[A], 2013 NY Slip Op 50808[U] [Sup Ct, Sullivan County 2013]), when the husband refused to pay the mortgage, the court ordered interim sale of a marital residence under the theory that the sale was required to preserve the asset. The court noted that under the equitable distribution law the “courts have recognized the judicial flexibility and discretion needed to issue orders necessary to preserve marital assets in danger of being dissipated during the pendency of the divorce proceeding.”[3] (2013 NY Slip Op 50808[U], *4; see also Lidsky v Lidsky, 134 Misc 2d 511 [Sup Ct, Westchester County 1986] [ordering the refinancing of marital property to preserve family assets];[4] St. Angelo v St. Angelo, 130 Misc 2d 583 [Sup Ct, Suffolk County 1985] [house in danger *1008 of foreclosure could be sold over objection of one spouse pendente lite]; but see Shammah v Shammah, 22 Misc 3d 822 [Sup Ct, Nassau County 2008] [declining to order sale of property pendente lite].)
In this court’s view, it would be impossible to argue—the husband does not even attempt to do so in this case—that the excessive costs for the marital property might justify a prejudgment sale order under the theory expressed in Stratton v Stratton. This court is unsure whether the holding in Stratton v Stratton even survives a vigorous analysis under the rubric of Kahn v Kahn. But, the practical considerations underlying Stratton v Stratton—how to stretch or preserve family resources to benefit both parties during the pendency of a divorce—have a pragmatic appeal. The substantial housing costs in this case obviously eat into the available family resources to pay maintenance. And while temporary maintenance has specific statutory considerations that underlie it, the requirement that a spouse reside in an expensive home during the pendency of the action (while the nonresident spouse pays the mortgage and costs) is not among them. In considering whether an ordered sale before a final judgment is even prudent, this court notes that the legislature, in suggesting criteria to be considered when awarding temporary maintenance, shared the same practical-financial concern as this court that parties should attempt to reduce expenses during the pendency of divorce proceedings. The temporary maintenance guidelines include a caution that the courts should not permit “wasteful dissipation of marital property.” (Domestic Relations Law § 236 [B] [5-a] [e] [1] [e].) The inclusion of this provision, among the considerations that a court could consider in a temporary maintenance application, suggests that the legislature was concerned that temporary maintenance be directed to preserve family assets, as prudently as possible, while benefitting the recipient and not others. While this statutory command, broadly read, might suggest that a prejudgment sale, to prevent “wasteful dissipation” of the couple’s only source of income (the husband’s paycheck), might *1009 be justified in this case, this court declines to extend the principle that far. The large household expenses in this case, while they may not rise to the level of “wasteful dissipation,” surely exhaust family resources. The husband is paying for a luxury (maintaining two residences) that a split family cannot afford. In short, the tenor of the temporary maintenance guidelines, in seeking to prevent “wasteful dissipation,” suggests that the legislature wanted couples to be thrifty, while maintaining pre-separation lifestyles during the divorce process. The thrift envisioned by the legislature evades the couple in this case because an expensive house drains family resources. Paying for an overly expensive house, that cannot be sold under the principles of Kahn v Kahn, strikes this court as a waste of money that could otherwise provide for the wife and her daily needs.[5]
[6] This court cannot change the impact of Kahn v Kahn on families mired in divorce with the unmanageable expense of a marital residence, but at some point, the Court of Appeals—or the state legislature—should take another look at the impact of this resource-draining precedent on families in the midst of divorce litigation.
Maintenance
The starting point for this analysis is the husband’s income: $152,673. The husband argues for another number, claiming that his annual income is only $134,392.88, a figure for which the court cannot determine the source. The husband’s W-2 statement from his employer lists his gross pay as $152,673.03. The statute requires that his Social Security payments be deducted. (Domestic Relations Law § 236 [B] [5-a] [b] [4] [a].) His W-2 reveals $7,254 in Federal Insurance Contributions Act (FICA) payments in 2013. His resulting income for purposes of the temporary calculation is $145,419.03.
*1010 1. Imputing Income to the Wife for Maintenance Purposes
The next step involves a more speculative calculation: what income, if any, should be imputed to the wife for purposes of the formulaic dictates of the Domestic Relations Law? A court need not rely upon a party’s own account of his or her finances, but may impute income based upon the party’s past income or demonstrated future potential earnings. (Haagen-Islami v Islami, 96 AD3d 1004 [2d Dept 2012]; Cusumano v Cusumano, 96 AD3d 988, 989 [2d Dept 2012]; Matter of Gebaide v McGoldrick, 74 AD3d 966 [2d Dept 2010]; Matter of Berg v O’Leary, 193 AD2d 732 [2d Dept 1993] [imputation based upon prior employment experience].) The available proof sufficient to impute income can also include an individual’s educational background, or money received from friends and relatives.[6]
On this issue, the party seeking to have income imputed bears the burden of proof and must prove by the preponderance of the evidence that the party, against whom imputation is sought, is underemployed, has spurned employment, or is otherwise responsible for reporting less income than his or her earned income potential. (Davis v Davis, 117 AD3d 672 [2d Dept 2014] [the burden of proof is on the party seeking to impute income to the other party].) In this case, a slightly different aspect of the usual imputation rules surfaces. In many cases discussing imputation, the party against whom imputation is sought has generated a higher income in the past than he or she declares at the time of court review. (Matter of Bustamante v Donawa, 119 AD3d 559 [2d Dept 2014] [party had higher income when he left employment]; Hainsworth v Hainsworth, 118 AD3d 747 [2d Dept 2014] [amount imputed was reflective of his past income and demonstrated earning potential].) In those instances, the past income exceeds the current income and a court, surveying the past income, can easily conclude that imputation is justified because there is undisputed evidence of prior earning potential. (Lennox v Weberman, 109 AD3d 703 [1st Dept 2013] [may impute income based upon the party’s past income or demonstrated earning potential].) The party seeking to impute income usually meets his or her initial burden of proof by offering a tax return which shows the past income, and the court can easily infer that the return is evidence of earning potential. (Matter of Mayer v Mayer, 12 Misc 3d 1151[A], 2006 NY Slip Op 50854[U] *1011 [Fam Ct, Orange County 2006] [party’s past income or demonstrated earning potential].)
The husband here suggests that the wife’s imputed yearly income should be $20,000—more than her last annual earnings—but he provides no facts to justify such an imputation. The wife, currently unemployed, proposes no imputation, arguing that she is no longer in the work force. In her petition to this court, the wife acknowledges that prior to the summer of 2013, she earned “up to $15,000 per year,” working a part-time job in the public schools. The husband argues that the wife provides no evidence that she has sought employment in any capacity since her retirement. Importantly, the wife’s failure to come forward with evidence of a diligent job search only becomes pertinent if the husband, who has the burden of proof, establishes a prima facie case that imputation is justified. The husband’s offhand suggestion that “some imputation is justified” does not meet the burden. Competent evidence must be submitted to support such a finding. (Rossiter v Rossiter, 56 AD3d 1011 [3d Dept 2008].) The husband offers no evidence that the wife has turned down offered jobs or evidence of any job search by the wife. There is no evidence regarding what she is capable of earning. (Kessler v Kessler, 118 AD3d 946 [2d Dept 2014].) As another Court suggests, a party’s failure to engage in these reasonable job hunting activities would justify a court concluding that the party failed to rebut a justified imputed income. (Matter of Virginia S. v Thomas S., 58 AD3d 441 [1st Dept 2009] [lack of any evidence of good faith efforts to obtain employment commensurate with his experience and qualifications as factor in determining that the party failed to meet his burden of proof to rebut imputation of income].) However, given that the husband has the burden of proof, he must show that if the wife sought employment, the result would be a job paying something commensurate with his suggested “imputed income” of $20,000 annually. The husband’s suggestion that the wife is obligated to seek employment is a justified legal position, but only if the husband establishes a prima facie case that such an effort by the wife would produce employment commensurate with the suggested imputed income. The wife’s obligation to prove a diligent search for employment does not arise until the husband meets his burden to prove that the employment would be available. The Court of Appeals, in a comparable context decades ago, intoned:
*1012 “True, the wife here is college educated . . . but she has not participated in the job market for many years, indeed not at all during almost her entire adult life . . . We hold only that where he has acquiesced in and benefited from her role as wife and mother for 23 years, he may not now, for his own economic reasons, force her into a different role without demonstrating . . . that it has economic viability.” (Kay v Kay, 37 NY2d 632, 638 [1975].)
In this case, the wife retired when the couple was married. Her retreat from the workplace was a decision in the context of the marriage and the husband cannot now be heard to complain that his wife has left the job market. Given that fact and the conclusion that the husband has failed to meet his burden of proof, this court declines to impute any income to the wife.
2. The Temporary Maintenance Guidelines and the Wife’s Request for an Upward Deviation
With the incomes established, the next step in this court’s analysis is applying the temporary maintenance guidelines in the Domestic Relations Law. (Domestic Relations Law § 236 [B] [5-a].) The statute dictates that this court “shall order” the amount of temporary maintenance as calculated by the Domestic Relations Law unless the court finds the presumptive amount “unjust or inappropriate.” (Domestic Relations Law § 236 [B] [5-a] [e] [1].) Because the court imputes no income to the wife, the court uses the husband’s income of $145,419.03 and the resulting calculation of temporary maintenance is $3,635.48 per month.[7]
The wife seeks an upward deviation from this amount, arguing that the calculated presumptive temporary maintenance is too meager. The wife bears the initial burden of proof to show that the calculated temporary maintenance is unjust or inappropriate. (Domestic Relations Law § 236 [B] [5-a] [e] [1].) In this court’s view, the calculation is unjust, as it does not factor in the high costs of the marital residence. The presumptive payment number under the guidelines would pay less than 40% of the wife’s anticipated monthly expenses. Given these expenses and the wife’s lack of employment during the pendency *1013 of this action, the amount derived from the temporary maintenance calculation is unjust and inappropriate. This court may now explore the 17 factors which, by statute, permit this court to adjust the presumptive award of temporary maintenance.
The wife, in her papers before this court, does not focus her attention on the “deviation factors.” Instead, she approaches the need for an upward deviation from a cost analysis. She argues that she needs more money than the temporary maintenance calculation directs to pay the substantial carrying costs for the house and her household. She requests that this court order the husband to pay the monthly charges, including: mortgage ($1,114.36), real estate taxes ($1,012.21), utilities ($709.48), insurances (which total $1,005.66 and include life, homeowner’s, automotive and medical plan), home repairs (which are listed at $100 per month, but are included in a category listed as “household maintenance” and total $784 monthly), and cable ($146 per month).[8] These expenses total $4,771.71. The wife also asks that the husband pay the credit card bills and cell phone bill for his wife and contribute an additional $1,500 monthly as maintenance. In sum, the wife seeks support in an amount of at least $6,271.71 per month or nearly twice the amount of temporary maintenance as suggested by the temporary maintenance guidelines set forth in the Domestic Relations Law. The husband, in his affidavit, acknowledges that he has been paying the mortgage, HELOC ($200 per month), real estate taxes ($1,000), gas and electric ($350), kitchen table ($80), auto and house insurance ($200), the cell phone bills ($145), cable ($175), the credit cards ($1,000), and water, newspaper, and garbage ($85). These expenses total $4,235 or nearly 17% higher than the temporary maintenance guidelines would require him to pay.
Even if this court ordered maintenance in the amount requested by the wife—$6,271.71 per month—she would still be living, according to her statement of net worth, at a deficit of $5,300 monthly and, after a few months, digging a huge hole in *1014 her balance sheet, if she has not already.[9] The wife already admits that she has incurred more than $20,000 in credit card debt since the commencement of the divorce. Why would the court create a scenario where either party has to pour huge sums into paying third parties (banks, credit card companies, utilities, cell phone companies, and cable companies) while the recipient continually incurs huge amounts of debt? It is unfathomable. Whatever purposes temporary maintenance—or permanent maintenance for that matter—is designed to achieve (maintenance of lifestyle,[10] meeting reasonable needs, [11] economic independence,[12] support for a future[13]) an award that would be justified on its face under the temporary maintenance guidelines, but nonetheless never permit the wife to dig out of a perpetual financial hole, is neither logical nor practical. In this case, the wife’s monthly expenses—more than $11,000 per month according to her statement of net worth—cannot be justified.
Against this backdrop, the wife has the burden of proof to demonstrate grounds for the upward deviation.[14] Several factors under the temporary maintenance guidelines—undisputed in the papers before the court—point in the direction of an upward modification. This couple enjoyed a high standard of living. (Domestic Relations Law § 236 [B] [5-a] [e] [1] [a].) The couple is relatively older, but in good health. (Domestic Relations Law *1015 § 236 [B] [5-a] [e] [1] [b].) The wife’s earning capacity is, she claims, diminished because she has recently retired. It is undisputed that she has few job skills, while the husband has an advanced degree and significant skills. (Domestic Relations Law § 236 [B] [5-a] [e] [1] [c].) The wife does not suggest she intends to engage in additional retraining. (Domestic Relations Law § 236 [B] [5-a] [e] [1] [d].)[15]
The wife also suggests, albeit indirectly, that the husband “inhibited her ability to earn additional income” by encouraging her early retirement and then departing the marriage. (Domestic Relations Law § 236 [B] [5-a] [e] [1] [h].) She alleges that her decision to drop out of the work force and her current retirement were a result of a joint “plan for me to retire.” While the court is sympathetic to this stance, it does not afford the wife any greater weight in the final decision regarding maintenance. Why she left her employment is not a factor. Whether she can reenter the job market and attain reasonable employment, given her skill set, is. In considering this factor, the question is whether the husband’s conduct “inhibited” her reemployment. In Domestic Relations Law § 236 (B) (5-a) (e) (1) (h), the language refers to actions by one spouse that “inhibit” the other’s ability “to obtain meaningful employment.” It then gives as an example domestic violence. There is no evidence or allegations of such conduct in this case, but the legislature did not intend to solely confine “acts by one party against another” to just domestic violence. The statute states that this provision will “include but . . . not [be] limited to” domestic violence. (Id.) In this court’s view, if the wife can prove that the husband, by encouraging his wife to retire, crimped her future ability to obtain employment, then her claim for temporary maintenance is enhanced. In addition, her claim for upward modification could be given greater credence by this court because clause (h) in the deviation factors has a further corollary in clause (k), which requires the court to consider “the inability of one party to obtain meaningful employment due to age or absence from the workforce.” (Domestic Relations Law § 236 [B] [5-a] [e] [1] [k].) The wife, in seeking modification of the guidelines, invokes the first criterion, arguing that her age militates against finding *1016 “meaningful employment.” She also argues that although she worked during the marriage, she worked at less than her earning capability, and her recent retirement, to some extent, impacts her ability to return to where she previously worked.[16] She claims that her recent retirement—and absence from the job market for more than a year—is the type of “absence” referenced in clause (k) and militates in favor of a modification.
This court declines to credit the wife’s claim because she offers no proof to justify the conclusion. In regards to an upward deviation, she has the burden of proof to show that she attempted to obtain employment and could not find it. There is no evidence that she sought employment. In the absence of some proof—rejected applications, denied interviews, website search results—this court will not accept a stereotype—older workers cannot find meaningful employment—as a substitute for facts. While the wife may believe that she will be unable to find suitable employment and have some reasonable justification for that belief, there is no proof in this record that she has tried. Without some prima facie proof, this court declines to credit her allegations on her lack of job opportunity as a factor in justifying an upward deviation in temporary maintenance.
The wife’s attempt to invoke other factors under the temporary maintenance guidelines encounters the same difficulty. Domestic Relations Law § 236 (B) (5-a) (e) (1) (o) advises the court to consider the “reduced or lost earning capacity” of the wife as a result “of having foregone or delayed education, training, *1017 employment or career opportunities during the marriage.” By including this provision, in conjunction with clauses (h) and (k), the statute directs consideration of the exact circumstances present here—a wife who raises the children, works part time in a job to be available for her children and, as she claims, for her husband, and, as a result, foregoes career advancement. In Domestic Relations Law § 236 (B) (5-a) (e) (1) (p), the court may also consider the “contributions and services” of the wife as “spouse, parent, wage earner and homemaker” to the career of her husband. In this long-term marriage of 26 years, the wife alleges that it “was absolutely agreed” that “his career would be the priority” and that her responsibility “would be to maintain our home, care for the children and work at school.” She maintains that she encouraged her husband to pursue the advanced degree which now supports his current highly-paid position.
In order to invoke these additional statutory provisions that favor an upward deviation in temporary maintenance, the wife, as noted earlier, must adduce proof that she had a reduced employment capability caused by foregone opportunities. (Massirman v Massirman, 78 AD3d 1021 [2d Dept 2010] [wife failed to provide proof of reduced earning capacity because of foregone career opportunities].) In this regard, the wife’s proof falls short. While she contends that she will “never be able to secure employment or generate income anywhere near to that” generated by her husband, she offers no proof that she had even tried to find any employment. She attests that she has done some baby-sitting to generate small amounts of episodic income. She states that she has “no confidence” that she will be able to earn a significant living. But apart from her speculation, there is no evidence that she has sought any “meaningful employment” in the last year since the husband vacated the marital residence. Because there is no evidence that she attempted to secure employment, this court cannot draw any conclusion that her employment opportunities are circumscribed as a result of the factors listed in Domestic Relations Law § 236 (B) (5-a) (e) (1) (0) . Although this court can find social science evidence to support her speculation, it cannot base any determination on speculation or scientific studies, without some proven facts indicating the wife sought employment and could not find it.
While this might seemingly end the court’s inquiry, the court instead focuses on Domestic Relations Law § 236 (B) (5-a) (e) (1) (q): the statute’s attempt to reserve to the court a seemingly *1018 endless equitable power to achieve a “just and proper” temporary maintenance allocation. In prior cases, this court, among others, has used the broad scope of the (q) factor to evaluate temporary maintenance proposals. (E.J.L. v K.L.L., 38 Misc 3d 389 [Sup Ct, Monroe County 2012]; see also Scott M. v Ilona M., 31 Misc 3d 353 [Sup Ct, Kings County 2011] [the court held that a downward modification of the presumptive calculation was appropriate under the statute].) In this court’s prior analysis, the central consideration that can justify a deviation under the (q) factor is practical income shifting that occurs when temporary maintenance is granted and its impact on the “net available resources” for each party. (See E.J.L. v K.L.L., 38 Misc 3d 389 [Sup Ct, Monroe County 2012].) Under this analysis, the court attempts to calculate the tax consequences and other costs for each party and to equitably divide the party’s “net income available for expenses” during the pendency of the action. When utilized, the net available resources analysis focuses on the true cash position of the parties and their evident needs.
Under this analysis, the husband’s income, while significant, is quickly melted down. His $152,000 annual salary is reduced by FICA ($7,254) and income taxes (estimated $34,000 for federal[17] and $9,000 for state[18] equaling $43,000), which leaves him with approximately $101,000 in available resources annually. If the husband were required to pay what the wife has suggested in temporary maintenance—an estimated $72,000 annually—the husband’s available cash would decline from $101,000 to $29,000. The husband would get a huge tax deduction for the maintenance and therefore, the calculation of net resources for him after paying temporary maintenance as requested by the wife would be more like: $144,000 net income (after FICA), he pays maintenance ($72,000), leaving him with $72,000 in available pretax income. He would pay approximately $17,000 in federal and state taxes leaving a net available after-tax resources of approximately $55,000. The wife would have $72,000 in income—assuming no income other than the maintenance payments—and pay perhaps $17,000 in state and federal income *1019 taxes. The wife would be left with approximately $55,000—in actual net resources (assuming that she never earns any other income). However, as noted earlier, this division of the family’s available income would involve a temporary order that is nearly twice the presumed amount of temporary maintenance suggested by the statutory guidelines. Importantly, even if maintenance is paid at twice the statutory rate, the wife’s current expenses will still greatly exceed any maintenance paid to her. The reason is simple—the exorbitant costs of the house and household. But, without authority to order a sale of the house, this court must fashion a temporary maintenance order that somehow covers the housing costs while providing some disposable income to the wife.
Having considered the calculated “presumptive amount to be unjust and inappropriate,” this court concludes that several factors require an upward deviation of this amount. The wife’s age, her support for the husband during the marriage, and Domestic Relations Law § 236 (B) (5-a) (e) (1) (q) clearly justify the upward deviation, even though the wife failed to meet her burden of proof under the other employment-related factors. The (q) factor also allows this court, at this stage of the proceeding, to consider the cost of the expensive home and household, which the husband, during the marriage, maintained and subsidized. He subsidized an expensive lifestyle—and an expensive house— for his wife and his children. These factors support an upward deviation to $5,000 per month in temporary maintenance. Under the “net available resources” analysis, the estimated breakdown would be as follows:
Husband
Net Income after FICA $144,746
Maintenance Paid $60,000
Net Income $84,746
Taxes (estimated federal and state) $19,000
Net Income Available $65,746
Wife
Net Income after FICA $0
Maintenance Received $60,000
Net Income $60,000
Taxes (estimated federal and state) $12,000
Net Income Available $48,000
*1020 However, upon receipt of the payments, the wife will be entirely responsible for all household expenses listed in her statement of net worth and shall pay all joint obligations associated with the house—mortgage, HELOC and taxes—with this monthly payment until either a final maintenance award or the house is sold, whichever first occurs. This amount is temporary only, and is driven upward by the costs associated with the house and household. An award of permanent maintenance would, to be considered just and fair, not require the husband to perpetually support this house and household. In addition, once equitable distribution of substantial marital assets occurs, the husband’s maintenance contribution would be less as the wife acquires new assets and a home more in line with the couple’s post-divorce financial status.
Because the wife is the lesser moneyed spouse, she is awarded $5,000 in legal fees to be paid within 30 days of the entry of the order in this case. (Odermatt v Odermatt, 119 AD3d 754 [2d Dept 2014]; G.T. v A.T., 43 Misc 3d 500 [Sup Ct, Suffolk County 2014].)
Conclusion
The husband’s request to set a temporary maintenance award is denied. The wife’s request for a deviation from the presumptive amount of maintenance, as set forth in the temporary maintenance guidelines, is granted and the husband is required to pay $5,000 per month until the further order of this court. These payments should commence immediately. The court will consider any arrears upon separate application in the future. The wife is awarded legal fees in the amount $5,000 to be paid within 30 days after entry of this order.

. The husband, in his application to the court, refers to his income as $134,392. However, his W-2 wage statement shows his annual gross wages as $152,673. Apparently, the husband contributes substantial sums to his retirement account and his W-2 indicates that he makes contributions to unspecified accounts in excess of $26,000. Hence, for purposes of calculating the temporary maintenance, the court utilizes the gross wage figure of $152,673.

. It is well-settled that unless the court alters the legal relationship of husband and wife by granting a divorce, an annulment, or a separation or by declaring a void marriage a nullity, it has no authority to order the sale, pendente lite, of a marital residence allegedly owned by the parties as tenants by the entirety. (See Citimortgage, Inc. v Nicodemus, 31 Misc 3d 1215[A], 2011 NY Slip Op 50681[U] [Sup Ct, Dutchess County 2011] [only contemplated exception to Kahn v Kahn occurs if there is a danger that the property will be removed from the state, lost, or materially injured].)

. The court in Stratton v Stratton also noted a temporary receiver may be appointed on motion, when property subject to the action is in danger of being lost, damaged or destroyed. (CPLR 6401 [a].)

. The wife here claims that she needs immediate dental work, which could total in excess of $10,000. If unfettered by Kahn v Kahn, this court *1008 would direct that the husband allow the wife to use the HELOC to finance the dental emergency, and deal with the implications of the borrowing in the final equitable distribution. However, the court is concerned that the holding in Lidsky v Lidsky—which ordered interim refinancing over a party’s objection— clashes with the rule in Kahn and the legislature’s “automatic” orders that accompany all divorce complaints and prohibit any transfers during the pendency of such actions. (Domestic Relations Law § 236 [B] [2] [b]; 22 NYCRR 202.16 [a]; Sykes v Sykes, 35 Misc 3d 591 [Sup Ct, NY County 2012].)

. Kahn v Kahn mandates that the tenancy by the entirety should not be severed until after the divorce. However, there is a counterargument that merits some consideration: as a consequence of the legislature’s enactment of no-fault divorce, divorce in New York is now inevitable, as the “irretrievably broken down” grounds in Domestic Relations Law § 170 (7) no longer require a trial. With grounds established, any divorce action—unless a party withdraws—will lead to a divorce (either by agreement or trial). Thus, the tenancy by the entirety created by the marriage will be ended and the husband and wife become tenants in common in every divorce action. Given the inevitability of divorce, the public policy reluctance to fracture the tenancy by the entirety pendente lite seems to be lessened, and if there are obvious benefits to preserving family resources through sale of the property, an interim sale would seem to be justified.

. There is no suggestion in the papers before this court that the wife receives any financial help from any other source.

. If the husband’s salary is $145,419.03 annually and the court were to impute $20,000 in annual income to the wife, the temporary maintenance guidelines suggest the husband should be paying $3,302.14 per month or $39,625.71 annually. Both that figure and the number used above are derived from New York State’s online calculation tool. (Temporary Spousal Maintenance Guidelines Calculator, http://www.nycourts.gov/divorce/calculator.pdf.)

. All of these amounts are derived from the wife’s sworn statement of net worth. This court notes that some of the expenses listed seem to be excessive including $1,200 monthly for groceries, $134 monthly for home entertainment, support for care for each emancipated child, and $200 per month for gifts. Her annual spending—listed at $11,584.54 per month stretched over a year—would completely swallow the husband’s entire annual income.

. The wife’s financial picture would be further clouded because these payments would be taxable to her, further draining her resources.

. Salman v Salman, 37 Misc 3d 1210(A), 2012 NY Slip Op 51964(U) (Sup Ct, Kings County 2012).

. Westreich v Westreich, 44 Misc 3d 1217(A), 2014 NY Slip Op 51170(U) (Sup Ct, Nassau County 2014) (reasonable needs of a dependent spouse are met during the pendency of a divorce proceeding).

. Cohen v Cohen, 120 AD3d 1060 (1st Dept 2014) (the overriding purpose of a maintenance award is to give the spouse economic independence).

. Angel v O’Neill, 114 AD3d 486 (1st Dept 2014) (the purpose of maintenance is to give the recipient spouse a sufficient period to become self-supporting).

. This court notes that there has been little discussion of the burden of proof in the context of the various “deviation factors” under the temporary maintenance guidelines. One case firmly ascribes the burden to the proponent of a deviation from the temporary maintenance guidelines. (Westreich v Westreich, 44 Misc 3d 1217[A], 2014 NY Slip Op 51170[U] [Sup Ct, Nassau County 2014] [burden is on the spouse seeking the award to establish the need for temporary maintenance].) In other cases, the court has searched the record to find evidence concerning the various factors. (Katz v Katz, 41 Misc 3d 1225[A], 2013 NY Slip Op 51833[U] [Sup Ct, Kings County 2013].) In this court’s view, the proponent of an upward modification has the burden of proof and the establishment of the factors would justify a deviation.

. Other factors listed in the statute—transfers prior to the commencement of the action and existence of premarital joint household—are not pertinent here. There is also no evidence of health insurance and its costs, nor of any exceptional costs for the children or the tax consequences for the parties.

. The wife’s concern about employment opportunities for older workers finds some justification in social science literature. See Harper, Symposium: The Workplace Law Agenda of the Obama Administration, Reforming the Age Discrimination in Employment Act: Proposals and Prospects (16 Emp Rts & Emp Pol’y J 13, 20-21 [2012]):
“The impact of even economically rational stereotype-based age discrimination on American society is aggravated by the injustice and frustrations felt by many older workers who perceive that they have not been treated fairly by their employers. That perception, whether or not accurate in particular cases, is reflected in the continuing growth in age discrimination charges filed with the Equal Employment Opportunity Commission (EEOC) over the past dozen years as the Baby Boom generation has aged. Those charges numbered over 23,000 and constituted almost one-fourth of the total charges filed with the EEOC during the 2010 fiscal year, an increase of about 7,500 charges from fiscal year 1997, when less than one-fifth of the charges included allegations of age discrimination. The perception of continuing age discrimination in the American workplace is also reflected in tbe results of studies conducted by social scientists.”

. The federal tax calculation is an estimate, derived from a tax calculator website. The court uses this site and the calculation for illustration purposes only (Bankrate, 1040 Tax Calculator, http://www.bankrate.com/ calculators/tax-planning/1040-form-tax-ealculator.aspx).

. The state tax calculator is also used only for an illusion of New York State tax consequences (Tax-Rates.org, 2014 Income Tax Calculator, http:// www.tax-rates.org/income-tax-calculator/?action=preload).