J.H. v C.H. (2024 NY Slip Op 50220(U))

[*1]

J.H. v C.H.

2024 NY Slip Op 50220(U)

Decided on March 4, 2024

Supreme Court, Putnam County

Grossman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 4, 2024
Supreme Court, Putnam County

J.H., Plaintiff,

against
C.H., Defendant.

Index No. 500502 / 2021

Plaintiff appeared by Miller Zeiderman, 140 Grand Street, White Plains, NY 10601.
Defendant, at the time of the decision, appeared Pro Se.

Victor G. Grossman, J.

The following papers numbered 1 to 38 were read on the application of Defendant to compel Plaintiff to execute a Mortgage on the marital residence, and the cross-motion of Plaintiff to compel the sale of the marital residence:
Order to Show Cause — Affirmation / Affidavit / Exhibits 1 - 7
Order to Show Cause — Affirmation / Affidavit / Exhibits 8 - 38
Upon the foregoing papers it is ORDERED that the applications are disposed of as follows:
The applications before the Court compel a re-examination of Kahn v. Kahn, 43 NY2d 203 (1978). There, the Court of Appeals held that real property owned by spouses as tenants by the entirety may not be ordered sold prior to entry of a Judgment of Divorce, as the tenancy cannot be severed in the absence of a judgment. Although tenancies by the entirety remain a part of the real property law of New York (see, EPTL §6-2.2), the nature and legal incidents of the union of person in husband and wife in marriage—upon which tenancy by the entirety is founded—have over the course of time been fundamentally altered.[FN1]
Moreover, the post-Khan adoption and evolution of the Equitable Distribution Law (DRL §236), "no fault" divorce (DRL §170[7]) and the Automatic Orders (DRL §236B[2][b]) have resulted in a significant adjustment of the legal criteria bearing upon the dissolution of marriage and its attendant economic ramifications. In consequence, the foundation on which Kahn v. Kahn rests has been significantly weakened if not destroyed.
[*2]FACTUAL BACKGROUND
The parties were married on July 12, 2003. They have two daughters, ages 14 and 8. The older child requires special attention due to medical conditions and learning disabilities. She will never be self-sufficient. For years, the parties enjoyed a relatively lavish lifestyle, maintaining an apartment in New York City in addition to a residence in Garrison, and sending their children to high-priced Manhattan schools. They did so based primarily on the income Defendant received from a manufacturing enterprise, and in part with financial assistance from Plaintiff's parents. Plaintiff opted to function as homemaker in part to provide care for the older child, although she is now employed in a sales position which affords her flexible hours and commission-based pay. Her 1099 Form for 2022 reflects compensation of $5,700. With the onset of the Covid pandemic the parties relinquished their Manhattan apartment, and they resided together with their children in the marital home in Garrison until the tension became too great. Plaintiff now lives with her parents and the children, and the parties share an access schedule. The marital home is occupied by Defendant. A foreclosure proceeding was commenced in 2019 and discontinued upon Defendant's payment of $40,000 in July 2019. However, Defendant having failed to make the August 2019 payment the mortgage is once again in default and foreclosure proceedings are once again pending.
Defendant thereafter sought a loan modification with Wells Fargo Bank. The proposed Modification Agreement lists both parties as "Borrowers."[FN2]
Plaintiff would be obligated on the proposed forty (40) year Mortgage but not on the Promissory Note. The new principal balance would be $881,988.50, with monthly payments of principal, taxes, and insurance totaling $5,441.36.[FN3]
The Bank's appraisal of the marital residence valued the property at $1,400,000. There is an outstanding mortgage with a current principal balance of approximately $900,000. Without mortgage payments for several years, the accrual of additional secured debt for past interest, property tax and insurance payments is substantial. In addition, there is a home equity line of credit in the amount of approximately $300,000 (as of June 2019), and substantial judgments exceeding $400,000 against Defendant including:
American Express (as of 4/9/21) $84,480.61
Cavalry SPV I, LLC, as assignee of Citibank (as of 9/28/20) $217,774.30
American Express (as of 1/11/23) $103,899.60
Although it is unknown whether any portion of the outstanding judgments has been satisfied, it is evident that the parties have little or no equity in the marital home. Defendant's Statement of Net Worth also lists credit card debts to Barclay's Bank in the amount of $108,046, to Bank of America in the amount of $99,049, to UBS Bank in the amount of $193,072, and to Wells Fargo in the amount of $49,747, but those debts, totaling $449,914, have not been reduced to judgment.
Defendant has been the primary source of family income during the marriage. However, there are open issues as to Defendant's income at the time of submission of this motion. He claimed a net income of $3,500 per week (i.e., $182,000 per annum), which suggests a gross annual income of approximately $250,000. There are a variety of issues arising from Defendant's [*3]business dealings and non-compliance with discovery issues. A forensic accounting has been ordered at an additional expense to the parties (see, NYSECF Docs. No. 271, 282). Defendant's Statement of Net Worth lists his monthly expenses as $25,263 (i.e., $303,156 per annum), an amount that exceeds his claimed income by approximately 100%. His monthly pendente lite maintenance payments have been sporadic in frequency and amount. There are child support arrears as well. He has been unemployed but claims "I am about to be hired in new employment and I expect I will be compensated at over 200K per year. I expect the job in the next 30 days. I just had my last interview" (NYSECF Doc # 289, ¶8). Although no details about his prospective employer, position, location, salary, or benefits were provided, Defendant now claims that he is employed at an annual salary of $150,000.
THE PENDING APPLICATIONS
Pending before the Court are Defendant's application for an Order directing Plaintiff to execute the proposed 40-year Mortgage and Plaintiff's application for inter alia an order directing the immediate sale of the marital residence. At the call of the calendar, the Court was prepared to set a briefing schedule, but as the deadline for acceptance of the mortgage modification was expiring, Defendant felt compelled to respond orally to the Plaintiff's motion. After Defendant and counsel were afforded the opportunity to review Plaintiff's papers the Court heard oral argument on both applications and reserved decision. There are two issues before the Court. First: May the Court, or should the Court, impose upon a divorcing couple a 40-year mortgage to preserve a marital asset that lacks any clear value? Second: May the Court in the face of Kahn v. Kahn order a sale of the marital residence held as tenants by the entirety in the absence of a Judgment of Divorce?
LEGAL ANALYSIS
I. The Circumstances Plainly Do Not Warrant A New 40-Year Mortgage
The Court is asked to compel Plaintiff to execute a mortgage in the hopes of saving an asset without value for a family with no known or apparent ability to afford additional debt. Defendant relies on the fact that Plaintiff was willing to do so in a prior foreclosure proceeding and claims that the circumstances are no different now. Defendant asserts such an order is necessary to prevent the dissipation "of the main asset of the marriage." Plaintiff's position is clear: "I do not want to have any financial ties with Defendant and his constant financial games and maneuvers" (NYSECF Doc. # 307, ¶6). Plaintiff further asserts she will be harmed by signing the Mortgage even without liability on the Note. The likelihood of a future default by Defendant will affect Plaintiff's credit and ability to secure housing for herself and her children, especially when Defendant is before the Court unemployed or recently employed, without income, and not paying child support. From counsel's statements, Defendant apparently anticipates that a new mortgage will take years to foreclose while he resides in the residence, leaving Plaintiff unable to move on with her life. It is difficult to find a cogent rational reason to support Defendant's request for a new 40-year mortgage on the marital home. The application is therefore denied.
II. The Pendente Lite Sale of the Marital Home: Revisiting Kahn v. Kahn
Any realistic assessment of the parties' situation would lead to the conclusion that the marital home must be sold to salvage any remaining equity or at least to reduce the financial loss. The equitable considerations supporting that conclusion were masterfully articulated by Justice Richard A. Dollinger in D.R.D. v. J.D.D., 74 Misc 3d 237 (Sup. Ct. Monroe Co. 2021) and in Harlan v. Harlan, 46 Misc 3d 1003 (Sup. Ct. Monroe Co. 2014). Per Kahn v. Kahn, however, the tenancy by the entirety arising from the parties' marriage impedes the Court from taking appropriate action pendente lite and prior to the entry of a Judgment of Divorce.
A. Kahn v. Kahn
In Kahn, the Court of Appeals addressed the question "whether, in a matrimonial action, a court may order the sale of real property held by the parties as tenants by the entirety, even though the marital relationship has not been legally altered." Id., 43 NY2d at 206. Concerning tenancies by the entirety, the Court observed:
In contemplation of the law, husband and wife were but one person. (Matter of Klatzl, 216 NY 83, 85). Thus, a conveyance to them by name was a conveyance to only one person. (Stelz v. Shreck, 128 NY 263, 266 ). Because of the marital relationship they were said to be seized of the estate in its entirety: each being seized of the whole rather than of any undivided portion. (Bertles v. Nunan, 92 NY 152, 156; Stelz v. Shreck, 128 NY, at p 266, supra; Hiles v. Fisher, 146 NY 306, 312 ). At death, the survivor took the estate not because of a right of survivorship, but because the survivor remained seized of the whole. (Bertles v. Nunan, 92 NY, at p 156, supra; Jackson v. McConnell, 19 Wend 175, 178; Stelz v. Shreck, 128 NY, at p 266, supra).
Kahn, 43 NY2d at 206-207. The Kahn Court continued, "[t]he common law soon recognized that in addition to death a legal dissolution of the unity of husband and wife would necessarily affect the continuing validity of a tenancy by the entirety." Id., at 207. The Court quoted this highly salient principle from Judge Peckham's opinion in Stelz v. Shreck, 128 NY 263 (1891):
When the idea upon which the creation of an estate by the entirety depends is considered, it seems to me much the more logical as well as plausible view to say that as the estate is founded upon the unity of husband and wife, and it never would exist in the first place but for such unity; anything that terminates the legal fiction of the unity of two separate persons ought to have an effect upon the estate whose creation depended upon such unity.
Kahn, 43 NY2d at 207 (quoting Stelz v. Shreck, 128 NY at 267) (emphasis added).
In Kahn, no legal alteration of the parties' marital status ever occurred: the wife's action for a separation was withdrawn and the husband's action for a divorce was denied. The Appellate Division nevertheless ordered a sale of the marital residence. Reversing, the Court of Appeals held that "unless a court alters the legal relationship of husband and wife by granting a divorce, an annulment, a separation or by declaring a void marriage a nullity, it has no authority to order the sale of a marital home owned by the parties as tenants by the entirety." Kahn, supra, 43 NY2d at 210. Interestingly, the Court distinguished Caplan v. Caplan, 38 AD2d 572, and Pearson v. Pearson, 34 AD2d 797, on the grounds that in each of those cases a separation had been granted, all the while recognizing that "a separation decree does not dissolve the marriage." See, Kahn, supra.
B. Tenancy By The Entirety and the Union of Person In Husband and Wife in Marriage
The grounding of the concept of tenancy by the entirety in the union of person in husband and wife in marriage was eloquently articulated by the Court of Appeals in Bertles v. Nunan, 92 NY 152 (1883):
By the common law, when land was conveyed to husband and wife they did not take as tenants in common, or as joint tenants, but each became seized of the entirety, per tout, et non per my, and upon the death of either the whole survived to the other. The survivor took the estate, not by right of survivorship simply, but by virtue of the grant which vested the entire estate in each grantee. During the joint lives the husband could, for his own benefit, use, possess and control the land, and take all the profits thereof, and he could mortgage and convey an estate to continue during their joint lives, but he could not make any disposition of the land that would prejudice the right of his wife if she survived him.
This rule is based upon the unity of husband and wife, and is very ancient. It must have had its origin in the archaic period of our race, and it colored all the relations of husband and wife to each other, to the law and to society. In 1 Blackst. Com. 442, the learned author says: "Upon this principle, of an union of person in husband and wife, depend all the legal rights, duties and disabilities that either of them acquired by the marriage. I speak not, at present, of the rights of property, but of such as are merely personal. For this reason a man cannot grant any thing to his wife or enter into covenant with her; for [*4]the grant would be to suppose her separate existence, and to covenant with her would be only to covenant with himself." They were not allowed to give evidence against each other, mainly because of the union of person, for if they were admitted to be witnesses for each other they could contradict one maxim of the law, nemo in propria causa testis esse debet; and if against each other they would contradict another maxim, nemo tenetur se ipsum accusare.
Bertles v. Nunan, supra, 92 NY at 156-157.[FN4]
As the Court of Appeals subsequently recognized in Hiles v. Fisher, 144 NY 306 (1895), the husband's common law right to full control of land held via tenancy by the entirety with his spouse is not incident to the concept of a tenancy by the entirety—which is governed by a principle of equality of estate as between husband and wife—but derives instead from "the general principle of the common law which vested in the husband jure uxoris the rents and profits of his wife's lands during their joint lives. (2 Kent Com. 130; Stewart on Husb. & Wife, §308)." See, id., 144 NY at 313-314. In other words, the common law doctrines of tenancy by the entirety and jure uxoris are conceptually distinct, such that with the legal demise of a husband's right to control his wife's property the Court of Appeals recognized, in Goldman v. Goldman, 95 NY2d 120 (2000), that "[a]s tenants by the entirety, both spouses enjoy an equal right to possession of and profits yielded by property." Id., at 122. However, the ongoing evolution of married women's rights to property and otherwise, grounded in a recognition of the wife's separate legal identity, has over the course of time fundamentally altered the nature and legal incidents of the union of person in husband and wife in marriage upon which the tenancy by the entirety is founded.
In the 19th century, by a series of statutes including the Married Woman's Property Acts of 1848 (ch. 200), 1849 (ch. 375), 1860 (ch. 90), and 1862 (chs. 72 and 172), New York altered "the union of person in husband and wife" by:
• In 1848, "secur[ing] to married women the enjoyment of their real and personal property which belonged to them at the time of their marriage, or which they might thereafter acquire by gift, grant or bequest from third persons, and [] abrogate[ing] the common-law right of the husband in and to the real and personal property of the wife." See, Hiles v. Fisher, supra, 144 NY at 314. See also, Darby v. Callaghan, 16 NY 71, 75-76 (1857).
• In 1849, giving married women express authority "to grant or dispose of her property." See, Bertles v. Nunan, supra, 92 NY at 159. See also, Darby v. Callaghan, supra.
• In 1860, "empower[ing] a married woman to perform labor and to carry on business on her separate account; to enter into contracts in reference to her separate real estate; to sue and be sued in all matters having relation to her property, and to maintain actions for injuries to her person." See, Bertles v. Nunan, supra.
• In 1867, providing that "husband and wife could, in civil actions, be compelled to give evidence for or against each other." See, id., 92 NY at 160.
• In 1876, providing that "they could, in criminal proceedings, be witnesses for and against each other." See, id.
In each of those measures the State recognized the separate personhood of husband and wife as opposed to "the union of person in husband and wife" as described in Bertles v. Nunan, supra. This process continued apace until, in 1980, the U.S. Supreme Court could state that "[n]owhere in the common-law world—indeed in any modern society" is a woman denied "a separate legal identity." See, Trammel v. United States, 445 U.S 40, 52 (1980) (abrogating spouses' common law testimonial privilege). Since 1977, when Khan v. Khan was decided, courts have continued to draw out the implications of spouses' separate legal personhood. In 1984, for example, the Court of Appeals—observing that New York had long ago rejected the common law doctrine that a married woman's legal existence is "incorporated and consolidated into that of the husband" (see, 1 Blackstone's Commentaries [1966 ed.], p. 430)—abrogated the husband's "marital exemption" from liability for rape. See, People v. Liberta, 64 NY2d 152, 164 (1984).
This dilution of the legal fiction of the union of person in husband and wife in marriage set the stage for a wholesale revision post-Khan of New York matrimonial law, including the Equitable Distribution Law (1980), "No Fault" divorce (2010), and the Automatic Orders (2009). To those we now turn.
C. The Impact of the Equitable Distribution Law, "No Fault" Divorce, and the Automatic Orders
1. The Equitable Distribution Law
"Chapter 281 of the Laws of 1980, enacted on June 19, 1980, achieved a major and dramatic overhaul of the New York statutes which govern the economic life of the family and measure the rights and obligations of family members upon dissolution of the family unit .. With the enactment of the Equitable Distribution Law, the marriage relationship [is] viewed, more modernly, as an economic partnership. 'Upon its dissolution, property accumulated during the marriage should be distributed in a manner which reflects the individual needs and circumstances of the parties regardless of the name in which such property is held.' (Governor's Memorandum of Approval, McKinney's 1980 Session Laws, p. 1863)." McKinney's Cons. Laws of NY, Vol. 14, DRL §236, Practice Commentaries (Scheinkman), p. 32 (2010).
Thus, the Equitable Distribution Law worked a sea-change in the legal status of the marital relationship. It defines the unity of husband and wife in marriage as consisting not in a "union of person" but rather in an "economic partnership"; and it relegates claims grounded in title to property to secondary status, providing instead for equitable distribution of the economic fruits of that partnership, that is, of what the statute calls "marital property":
The term "marital property" shall mean all property acquired by either or both spouses during the marriage and before . . . the commencement of a matrimonial action, regardless of the form in which title is held . . .
DRL §236B[1][c]. In other words, under the Equitable Distribution Law, that which constitutes the union of husband and wife in marriage—the economic partnership—is deemed to have ended upon commencement of a matrimonial action. Recalling Kahn, "anything that terminates the legal fiction of the unity of two separate persons ought to have an effect upon the estate [i.e., the tenancy by the entirety] whose creation depended upon such unity." Kahn, 43 NY2d at 207 (quoting Stelz v. Shreck, supra, 128 NY at 267). Commencement of a matrimonial action terminates the legal fiction of unity as defined by the Equitable Distribution Law. When the prevailing legal framework has so radically changed, why should ancient concepts of title continue to prevent a pendente lite court-ordered sale of marital premises to advance the goals of the Equitable Distribution Law? Per Khan itself, the continuing viability of a tenancy by the entirety post-commencement is seriously in question.
2. "No Fault" Divorce
The seeds of "no fault" divorce were first planted in New York in 1966. Upon a legislative determination that "dead marriages . . . should be terminated for the mutual protection and well being of the parties and, in most instances, their children," DRL §170 was amended to provide for "no-fault" dissolution of marriage upon the parties' living apart for a prescribed [*5]period pursuant to an agreement or a judgment of separation. See, Covington v. Walker, 3 NY3d 287, 290 (2004) (quoting 1966 Report of the Joint Leg. Comm. on Matrimonial and Family Laws); Gleason v. Gleason, 26 NY2d 28, 39 (1970); DRL §170, subd. 5 and 6. Although permitting divorce on a "no fault" basis, the 1966 reform respected the unity of spouses in marriage, as it required either (1) the agreement of both spouses that their marriage was no longer viable, and/or (2) objective evidence, i.e., the parties' living apart for a substantial period of time without reconciling, that the marriage was truly dead. This was the legal framework in place in 1977, when Khan v. Khan was decided.
On this score, too, a post-Khan sea-change in the law has occurred. In 2010, DRL §170 was again amended to provide for "no fault" dissolution of marriage where:
7. The relationship between husband and wife has broken down irretrievably for a period of at least six months, provided that one party has so stated under oath. No judgment of divorce shall be granted under this subdivision unless and until the economic issues of equitable distribution of marital property, the payment or waiver of spousal support, the payment of child support, the payment of counsel and experts' fees and expenses as well as the custody and visitation with the infant children of the marriage have been resolved by the parties, or determined by the court and incorporated into the judgment of divorce.
The plaintiff spouse's averment to an "irretrievable breakdown" is uncontestable and establishes the cause of action for divorce as a matter of law. See, Hoffer-Adou v. Adou, 121 AD3d 618, 619 (1st Dept. 2014); Palermo v. Palermo, 35 Misc 3d 1211(A) (Sup. Ct. Monroe Co. 2011), aff'd 100 AD3d 1453 (4th Dept. 2012).
The unity of spouses in marriage is brittle indeed if one spouse may unilaterally and by unchallengeable fiat declare that the marriage is at an end. In the absence of any defense to a DRL §170(7) cause of action, divorce is essentially automatic. Here, the Complaint contains the requisite assertion of irretrievable breakdown (NYSCEF Doc. # 2), and despite Defendant's denial thereof his counterclaim contains the exact same allegation (NYSCEF Doc. # 7, ¶ 4), which Plaintiff admitted in her Reply (NYSCEF Doc. # 79 ¶1). The parties have stipulated that grounds for divorce are resolved and that Plaintiff shall obtain a "no fault" divorce pursuant to DRL §170(7) (Preliminary Conference Stipulation, NYSCEF Doc. # 19, p.2). The divorce is all but inevitable, and the entry of a judgment of divorce pursuant to DRL §170(7) is a formality. Once again recalling Kahn, "anything that terminates the legal fiction of the unity of two separate persons ought to have an effect upon the estate [i.e., the tenancy by the entirety] whose creation depended upon such unity." Kahn, 43 NY2d at 207. The legal fiction of unity as defined by the Equitable Distribution Law having been shattered by commencement of a matrimonial action, and one party's uncontestable declaration that an irretrievable breakdown has occurred having rendered the marriage "dead" in the eyes of the "No Fault" divorce law and the divorce inevitable, the reasoning of Khan itself dictates that a tenancy by the entirety is at this juncture no longer viable.
On a further note, as the Court of Appeals observed in Kahn, a formal dissolution of the marriage bond is not necessarily required before a tenancy by the entirety may be severed: the Court acknowledged that a decree of separation was sufficient, all the while recognizing that "a separation decree does not dissolve the marriage." See id., 43 NY2d at 207. In other contexts, formal entry of judgment of divorce has been reduced to a ministerial act with no practical consequence on property rights. See, Cornell v. Cornell, 7 NY2d 164, 171 (1959) (permitting entry of divorce nunc pro tunc so long as rights vested in the interim are not affected). See also, Lynch v. Lynch, 13 NY2d 615 (1963); Brown v. Brown, 208 AD2d 485 (2d Dept. 1994); Van Pelt v. Van Pelt, 172 AD2d 659 (2d Dept. 1991). To be sure, the entry of judgment pursuant to DRL §170(7) may not be regarded as a pure formality, as the statute itself provides that judgment may not be granted on the grounds of "irretrievable breakdown" unless and until issues of equitable distribution, maintenance, child custody and visitation, child support, and counsel and expert fees have been resolved by the parties or determined by the court and incorporated in the [*6]judgment. See, id. Cf., Matter of Forgione, 237 AD2d 438 (2d Dept. 1997). The conclusion nevertheless obtains that, the parties having commenced divorce proceedings and stipulated to a "No Fault" divorce—thereby eviscerating the unity of person in husband and wife in marriage underlying a tenancy by the entirety, there would appear to be no reason to delay a legal severance of the tenancy where a balancing of the equities would dictate a sale of the marital residence pendente lite to avoid financial hardship for the family and/or to preserve marital assets for equitable distribution.
A few New York courts have already reached that very conclusion. See, D.R.D. v. J.D.D., supra, 74 Misc 3d 237 (Sup. Ct. Monroe Co. 2021); Stratton v. Stratton, 39 Misc 3d 1230(A) (Sup. Ct. Sullivan Co. 2013); St. Angelo v. St. Angelo, 130 Misc 2d 583 (Sup. Ct. Suffolk Co. 1985). For reasons shown above, this Court concurs with Justice Dollinger in D.R.D. v. J.D.D., supra, that "the facts underlying and justifying the decision in Kahn v. Kahn, are significantly undercut by the enactment of equitable distribution and no-fault divorce under [DRL] Section 170(7)." Id., 74 Misc 3d at 246. Justice Dollinger nevertheless struggled to evade the impact of Khan. He wrote:
[C]ontinued adherence to the Court of Appeals' directive in Khan v. Khan exposes an anomaly in New York marital law. Under Kahn v. Kahn, a trial court cannot balance the equities of all the family—children included—in deciding whether to sell the marital residence while a no-fault divorce is pending but the same court can balance the same equities in deciding exclusive use and possession of the property during the pendency [FN5]and can apply the same equitable factors in the judgment of divorce or any post-judgment decision.[FN6]
It is illogical that the New York trial courts would have broad powers to balance the equities of a family to decide possession of property during a divorce, ownership of the property after the divorce but not have the power, when balancing the same equities, to order a sale during the pendency of the divorce. The equitable factors in play during the divorce—the cost of maintaining and staying in the house, the financial strain on either spouse or the family overall, the impact of mortgage and tax costs, the income tax consequences of keeping the house and who gets the tax benefits, the consequences to and need for stability for the children, the availability of reasonable alternative housing for any displaced spouse—are the same factors that New York matrimonial courts have weighed in the four decades since equitable distribution. Rather than straining to find an agreement in a long-delayed divorce—the case in Taglioni v. Garcia [FN7]
—or await a ruinous foreclosure—the case in A.P. v. F.L.[FN8]
—or pump family resources into a residence that is underwater and draining family finances—the case in this instance—New York matrimonial courts should have the power to balance the equities of a potential sale during the pendency of a no-fault divorce. This Court is not suggesting that the sluice gates for sales of marital property pendente lite be opened willy-nilly but, because the Legislature vested broad equitable powers to matrimonial judges under equitable distribution, those powers should permit a sale of a marital [*7]residence during the pendency if a balancing of well-known and often easily defined equities favor that result in the best interests of the family.
D.R.D. v. J.D.D., supra, 74 Misc 3d at 253-254.
This Court concurs with Justice Dollinger's analysis, so far as it goes, but further believes that his conclusion that a matrimonial court is empowered despite Khan to order the pendente lite sale of the marital home is substantially bolstered by the post-Khan enactment of the Automatic Orders in 2009. To that we now turn.
3. The Automatic Orders
In 2009, the Equitable Distribution Law was amended to incorporate "Automatic Orders" regulating the disposition of matrimonial litigants' property pendente lite. See, DRL §236B(2)(b)(1-5). Prior to 2009, the matrimonial court's authority to deal with property during the course of divorce proceedings and prior to judgment was located in DRL §234, which, per Khan v. Khan, does not permit the severance of a tenancy by the entirety pendente lite. See id., 43 NY2d at 208-210. In the pre-Equitable Distribution era this reading of DRL §234 served a salutary purpose. Husbands typically had a significant economic advantage over non-working wives, maintenance and child support guidelines did not exist, and the pre-judgment sale of a marital residence held by the spouses as tenants by the entirety could seriously jeopardize the economic security and well-being of the wife and children.
However, with the advent of the Equitable Distribution Law, as Judge Scheinkman has pointed out, the Automatic Orders have effectively superseded DRL §234: "the key statutory provision is no longer Section 234, the general authority for the matrimonial court to deal with property, but in the Equitable Distribution Law itself." See, McKinney's Cons. Laws of NY, Vol. 14, DRL §236, Practice Commentaries (Scheinkman), C236B:48, p. 328 (2010). The Automatic Orders impose serious restraints on the parties' pendente lite disposition of property so as "to prevent both parties from dissipating assets, [and] incurring unreasonable debts" (see, Memorandum in Support of Legislation). By the same token, the Orders afford the matrimonial court enhanced flexibility to deal with property prior to judgment to address those same issues and to promote the purposes of the Equitable Distribution Law. DRL §236B(2)(b)(1) provides:
Neither party shall sell, transfer, encumber, conceal, assign, remove or in any way dispose of, without the consent of the other party in writing, or by order of the court, any property (including, but not limited to, real property, cash accounts, stocks, mutual funds, bank accounts cars and boats) individually or jointly held by the parties, except in the usual course of business, for customary and usual household expenses or for reasonable attorney's fees in connection with this action.
While framed in the negative as a restriction on the parties, Section 236B(2)(b)(1) plainly contemplates the admissibility of a court order directing the sale pendente lite of real property jointly held by the spouses. The Legislature was presumably aware of Kahn v. Kahn when it enacted the Automatic Orders in 2009 yet did not exempt tenancies by the entirety and indeed placed no restriction on the kinds of estates in real property potentially subject to court-ordered sale pursuant to Section 236B(2)(b)(1). To construe the Automatic Orders as a liberation from the constraints of Kahn v. Kahn would assist the matrimonial court in mitigating the financial exigencies encountered by families enmeshed in divorce litigation, often for a period of years, and promote the salutary goals of the Equitable Distribution Law.
In this case, the mortgage on the marital residence is not being paid and if matters are allowed simply to take their course a foreclosure and the loss of whatever equity the parties may have in their home is inevitable. A sale pendente lite is needed to prevent the ongoing dissipation of assets and accumulation of unreasonable debt, and to preserve marital property—the equity in the home—for equitable distribution. The Court has the authority to determine whether the terms of a proposed sale are appropriate, to direct the disposition of the proceeds of sale in the best interest of the parties, and to take steps to alleviate any hardship resulting from the pre-judgment severance of the tenancy by the entirety and loss of the marital [*8]home.
D. Conclusion
The Court invokes its authority under DRL §236B(2)(b)(1) and orders a sale of the marital residence based on the circumstances presented and the needs of the parties. The property shall be listed for sale with a broker who participates in a Multiple Listing Service, and the parties shall accept any offer within ten (10%) percent of the asking price. Both parties shall cooperate with the broker and the house shall be maintained as ready for sale. The net proceeds of sale, after payment of the usual and customary expenses and closing costs, shall be escrowed pending further order of the Court.
In view of Kahn v. Kahn the Court does not adopt this course of action lightly. However, inasmuch as the exigencies as they exist militate strongly in favor of a prompt sale, the Court declines to stay its Decision and Order pending application, if any, to the Appellate Division.
IT IS SO ORDERED.
Dated: March 4, 2024
Carmel, New York
VICTOR G. GROSSMAN, J.S.C.

Footnotes

Footnote 1:It must be stressed from the outset that the Court addresses itself only to the "legal fiction" of the union of person in husband and wife in marriage.

Footnote 2: Although the Loan Modification required an acceptance on or before a specific date, now passed, the Court was advised that the deadline had been extended. The Court in any event does not view the issue as moot as it is readily capable of repetition.

Footnote 3: The moving papers do not explain how the unemployed Defendant, who owes arrears in child support and maintenance, will be able to pay $5,441.36 per month, nor is there any explanation why a bank would enter into a loan agreement with a borrower without apparent means to repay. The Court declines to speculate, but notes that while the motion has been sub judice Defendant became employed at an annual salary of $150,000. He recently submitted a projected net income for 2024 of $114,139, and projected expenses for 2024 of $106,774 exclusive of income or property taxes. It remains improbable that he could carry the proposed mortgage.

Footnote 4: Sir William Blackstone cited a 15th century definition of tenancy by the entirety from Sir Thomas Littleton:
 [I]f and estate be given to a man and his wife, they are neither properly joint-tenants, nor tenants in common: for husband and wife being considered as one person in law, they cannot take the estate by moieties, but both are seised of the entirety per tout et non per my [by the whole and not by a share, moiety, or divisible part]; the consequence of which is, that neither the husband nor the wife can dispose of any part without the assent of the other, but the whole must remain to the survivor.
2 William Blackstone, Commentaries on the Laws of England 181 (1765), quoted in Richard R. Powell, The Law of Real Property ¶620 (1991).

Footnote 5: Pursuant to DRL §§ 234 and 236B(5)(f), the court is specifically authorized to direct the use and occupancy of the marital home pendente lite "without regard to the form of ownership of such property."

Footnote 6: Pursuant to DRL §236B(5)(a, c, d), the court is specifically authorized to distribute marital property (including the marital home) equitably between the parties and to provide for the disposition thereof in the final judgment.

Footnote 7: 200 AD3d 44 (1st Dept. 2021).

Footnote 8: 57 Misc 3d 1223(A) (Sup. Ct. Queens Co. 2017).